IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| SHERRY MOORE-WILLIAMSON, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. 5:05-cv-140 (CAR) |
| v. | : | |
| | : | |
| MERCER UNIVERSITY, A/K/A | : | |
| THE CORPORATION OF MERCER | : | |
| UNIVERSITY, | : | |
| | : | |
| Defendant. | : | |

*ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

Plaintiff Sherry Moore-Williamson ("Williamson") brings this employment discrimination action against Mercer University ("Mercer"), her former employer, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and 42 U.S.C. § 1981. Through this action, Williamson complains that, based on her race (African-American) and gender, Mercer: (1) denied her a promotion; (2) discriminated against her in the terms and conditions of her employment; and (3) terminated her employment. In addition, Williamson alleges that Mercer retaliated against her after she threatened to pursue legal action. Finally, Williamson alleges a pendent breach of contract claim under Georgia law. Currently before the Court is Defendant's Motion for Summary Judgment [Doc. 23]. For the reasons stated below, Defendant's motion is **GRANTED**.

*BACKGROUND*

Plaintiff, Sherry Moore-Williamson, is a former employee of the Mercer Center for Community Development ("MCCD"). Defendant Mercer University ("Mercer") established the

1

MCCD in 1998 to strengthen ties between the University and adjacent neighborhoods. Since its inception, the MCCD has worked with civic and community leaders to build neighborhood capacity, leadership, and organization; strengthen educational opportunities for neighborhood residents; and assist in planning for community redevelopment. (Brown Dep. 15:18).

Williamson joined the MCCD in June 2003 as the "Neighborhood Builder." Before being hired, Williamson interviewed with the Director of the MCCD, Dr. Peter Brown ("Brown"), a Caucasian male, and the Program Manager, Maria Arvelo ("Arvelo"), an African American and Hispanic female. Although Arvelo did not want to hire Williamson for the Neighborhood Builder position, Brown hired her over Arvelo's objections. Brown's decision to hire Williamson over Arvelo's objections set the tone for what would become a conflicted working relationship between Williamson and Arvelo.

As the Neighborhood Builder, Williamson primarily was responsible for providing leadership training to individuals, groups, and organizations within the surrounding neighborhood in order to support neighborhood initiatives. In addition, Williamson attended community meetings and helped to implement community revitalization projects. (Williamson Dep. Exh. 20).

When Williamson began working for the MCCD, the staff consisted of six employees: Brown, the Director; Arvelo, the Program Manager; Ina Vaughns, the Community Development Specialist; Chris Roesel, the Community Health Systems Developer; and Shruti Desai, a student intern. Nearly one month into Williamson's employ, Roesel left MCCD and was replaced by Cheryl Robinson.

Shortly after Williamson joined the MCCD, the staff attended a retreat. The purpose of

the retreat was to identify and clearly define the roles within the small department. The retreat also focused on team-building and improving working relationships among MCCD employees. During the retreat, staff members discussed Arvelo's management style and several indicated that they did not want Arvelo as a supervisor. (Williamson Dep. 111-12). As a result of the retreat, several staff members' duties were changed, with Williamson assuming some of Arvelo's duties. (Williamson Dep. 113:20 & Exh. 13). In addition, Brown decided that, in light of Williamson's age and experience, he would supervise her instead of Arvelo.

Following the retreat, Willamson approached Brown seeking a change in job title to reflect her changed duties. Williamson proposed changing her title from "Neighborhood Builder" to "Program Manager," the same title that Arvelo held. (Williamson Dep. 120:23). Later, Williamson also requested a salary increase. (Williamson Dep. Ex. 14). Brown initially agreed to the title change and gave Williamson a PDQ (Position Description Questionnaire) to complete. Arvelo, however, objected to the change, arguing that she and Williamson had different duties, and therefore warranted different titles. After speaking with Arvelo, Brown decided against changing Williamson's title to Program Manager. (Brown Dep. 25-26). He reasoned that he "was trying to solve a personnel problem with a structural change, and that was a bad management move." (Brown Dep. 25-26). He then considered other titles for Williamson, such as Neighborhood Resources Coordinator. (Brown Dep. 25-26).

The conflict between Williamson and Arvelo abated throughout the remainder of 2003 and the beginning of 2004. In March 2004, however, the conflict resurfaced when, in the middle of a staff meeting, Arvelo accused Williamson of lying. Arvelo's accusation prompted Williamson to complain both to Brown and to Human Resources.

Williamson first wrote a letter to Brown summarizing her issues with Arvelo and expressing concern that her character was being defamed. (Williamson Dep. Exhs. 20-21). In her letter, Williamson advised Brown that she planned to contact Human Resources if the problems persisted, and ultimately would pursue legal action if necessary. (Williamson De. Exh. 20). Specifically, Williamson stated: "If no satisfaction is met [with Human Resources], I plan to take legal action against whatever parties my Attorney [sic] recommends. The cause[s] of action will be slander, defamation of character, and harassment along with whatever legal grounds I am advised to file." (Williamson Dep. Exh. 20). Brown responded with a letter of his own, in which he advised Williamson that she was free to file a complaint with Human Resources if she felt it appropriate. (Williamson Dep. Exh. 21).

Williamson then contacted Human Resources. She first met with Rhonda Lidstone, Mercer's Director of Human Resource Services/Affirmative Action. At the meeting, Williamson discussed her conflict with Arvelo and the overall "lack of cohesion and lack of leadership in the office." (Williamson Dep. 165:12). Lidstone referred her to Diane Baca, Mercer's Vice President of Human Resources. (Williamson Dep. 166:7). Williamson subsequently met with Baca to discuss her conflict with Arvelo. (Williamson Dep. Exhs. 24-26). After meeting with Arvelo to hear her side of the story, Baca referred the two to mediation. Williamson, however, declined to participate. (Williamson Dep. 184:20).

Shortly after Williamson complained to Human Resources, Brown conducted an annual performance review. In the review, Brown censured Williamson for her poor "attitude, focus, and commitment." (Williamson Dep. Exh. 27). Brown also criticized Williamson's unwillingness to mediate her personal differences with Arvelo. (Williamson Dep. Exh. 27).

Brown warned Williamson that if she did not modify her behavior, he would "have no option but to consider [her] removal from the team." (Williamson Dep. Exh. 27).

Meanwhile, unbeknownst to Williamson, Brown was engaged in talks with members of Mercer's administration to merge the MCCD with the University's Service Learning program. (Brown Dec. ¶ 9). Though the idea was raised as early as April 2003, the decision to merge the two programs was not finalized until late-May 2004. (Brown Dec. ¶¶ 11, 14, 16). Initially, Brown did not contemplate the need to eliminate any positions in the MCCD. After considering the merger in greater detail, however, Brown decided to eliminate a MCCD staff position to free up monies to fund additional faculty and support positions created as a result of the merger. (Brown Dec. ¶ 14). Brown chose to eliminate Williamson's position because the primary duties of the position were being eliminated as a result of the merger. (Brown Dec. ¶ 15).

Several months later, on June 28, 2004, Williamson was summoned to a meeting with Brown and Baca, where she was terminated. (Williamson Dep. 217). Afterwards, Baca instructed Williamson to return a cell phone and a set of office keys belonging to Mercer. (Williamson Dep. 218-19, 224-26). Williamson also lost access to many personal files she had stored on her office computer. (Williamson Dep. 227). After Williamson finished packing her belongings, Baca escorted her off of the premises.

Following her termination, Williamson filed the present lawsuit in this Court alleging race and gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and 42 U.S.C. § 1981, and a pendant breach of contract claim. Following discovery, Defendant filed the present motion for summary judgment.

***SUMMARY JUDGMENT STANDARD***

Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict. See id. at 249-52.

In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence. See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law. Celotex, 477 U.S. at 323 (internal quotation marks omitted).

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at

6

324-26. This evidence must consist of more than mere conclusory allegations or legal conclusions. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." Celotex, 477 U.S. at 323.

## *DISCUSSION*

Claims of employment discrimination brought under Title VII and § 1981 have the same elements of proof and use the same analytical framework. Standard v. A.B.E.L. Servs., 161 F.3d 1318, 1330 (11th Cir. 1998). Accordingly, the Court will consider Williamson's Title VII and § 1981 claims together. In Title VII and § 1981 cases, a plaintiff may establish a claim of employment discrimination either through the introduction of direct evidence of discrimination or through circumstantial evidence that creates an inference of discrimination. Bass v. Bd. of County Comm'rs, 256 F.3d 1095, 1103 (11th Cir. 2001). In this case, Williamson offers no legally significant direct evidence of discrimination.[1] Therefore, her claims will be analyzed under the burden-shifting framework described in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1972).

Under the McDonnell Douglas framework, an employee must first demonstrate a prima facie case of discrimination. Id. at 802. If the employee establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason

---

[1] In her brief, Williamson argues that Brown's instigation of conflict between Arvelo and herself constitutes direct evidence. Pl's Resp. Br. 12. Williamson's argument is meritless. "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." Akouri v. Fla. Dep't of Transp., 408 F.3d 1338, 1347 (11th Cir. 2005) (internal quotation marks omitted). Brown's only noted remark concerning the conflict— that "Arvelo wanted Williamson fired"—is not blatant in its suggestion of an intent to discriminate.

7

for its action. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). Once the employer provides a legitimate, nondiscriminatory reason for its action, the employee's prima facie case is rebutted. Id. at 253. The employee must then show that the employer's proffered reasons for its actions were not the real reasons that motivated its conduct, but rather, the employer's proffered reasons were merely pretext for discrimination. Id.

### 1. Termination Claim

Williamson first claims that her termination was based on her race (African-American) and gender. Mercer contends that Williamson's termination resulted from its decision to restructure the MCCD. Such being the case, Williamson's discriminatory termination claim may be more akin to a "reduction in force" claim. To establish a prima facie case of discriminatory termination, a plaintiff must show that: (1) she was a member of a protected class; (2) she was qualified for the job; (3) she was terminated; and (4) she was replaced by someone outside the protected class. Cuddeback v. Fla. Bd. of Educ., 381 F.3d 1230, 1235 (11th Cir. 2004). "When [a] plaintiff is terminated through a 'reduction in force,' the prima facie case is modified somewhat, such that the plaintiff must show: (1) that she is a member of a protected class; (2) that she was terminated; (3) that she was qualified for another position at the time of termination; and (4) that the employer intended to discriminate in failing to consider her for another position." Coutu v. Martin County Bd. of County Comm'rs, 47 F.3d 1068, 1073 (11th Cir. 1995).

Williamson fails to establish a prima facie case of discriminatory termination because she has failed to show that she was replaced by someone outside of the protected class. Indeed, Mercer did not replace her at all; it eliminated her position. Moreover, after Williamson left

8

Mercer's employ, her responsibilities were allocated among two African-American female employees.

Even analyzing Williamson's claim under the "reduction in force" framework, her prima facie case fails. Specifically, Williamson has failed to produce any evidence suggesting that Mercer's failure to consider her for another position was motivated by an intent to discriminate against her. Williamson argues that Mercer has a "history of discrimination," and that such history demonstrates Mercer's intent to discriminate against her. Williamson's conclusory allegations find little support in the record. Moreover, such general allegations, without more specific evidence showing a pattern of *recent* discrimination, fail to suggest that Mercer's failure to consider her for another position was based on her race or gender. Because Williamson has failed to establish a prima facie case of discriminatory termination, her claim fails as a matter of law.

### 2. Retaliation Claim

In the alternative, Williamson alleges that her termination was retaliatory. In order to establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected activity. Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1233 (11th Cir. 2006). Unquestionably, Williamson suffered an "adverse employment action" when she was terminated. Thus, the issues raised by the present motion are whether Williamson engaged in statutorily protected activity, and if so, whether there is a causal link between her actions and her termination.

Williamson argues that she engaged in protected activity when, during a meeting with

employees of Mercer's Human Resources Department, she threatened to "su[e] the university for defamation and the situation that was going on in the office and harassment." Pl. Br. 26-27. Accordingly, the Court must determine whether this remark amounts to "statutorily protected activity."

Title VII's anti-retaliation provision protects "individuals who have filed formal EEOC complaints [as well as] those who informally voice complaints to their superiors." Shannon v. Bellsouth Telecomm., Inc., 292 F.3d 712, 716 n.2 (11th Cir. 2002); see also Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1201 (11th Cir. 2001). For an informal complaint, such as the one voiced by Williamson, to constitute protected expression, there must be some mention of discrimination. Wehunt v. R.W. Page Corporation, 352 F. Supp. 2d 1342, 1358 (M.D. Ga. 2004) (citing Coutu v. Martin County Bd. of County Comm'rs, 47 F.3d 1068, 1075 (11th Cir. 1995) for the proposition that "[u]nfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful employment practice under Title VII."). An employee cannot complain to her supervisor about unfair treatment in a racially-neutral way and expect the employer to divine that her complaint is really of racial or gender discrimination. See id. "At a minimum, an employee must communicate to her employer her belief that discrimination was occurring." Id.

In this case, Williamson concedes that she never once mentioned race or sex discrimination during her meeting with Human Resources, or at any other time prior to her termination to anyone else at Mercer. (Williamson Dep. 178-79). Her complaints to Human Resources concerned only the "[l]ack of cohesion in the office and lack of leadership in the office" and her volatile relationship with Arvelo. (Williamson Dep. 165:12 & Exh. 23).

Williamson provides no reason as to why, despite her failure to mention race or gender discrimination to Human Resources, or to anyone else at Mercer, her comments should be viewed as "protected activity." Instead, she attempts to justify her failure to complain about discrimination by explaining that she did not trust people at the University. (Williamson Dep. 180:10). Williamson's failure to mention race or gender discrimination to anyone at Mercer—regardless of her reason—is fatal to her retaliation claim. There is no way that anyone at Mercer could glean from her general protestations to Human Resources that Williamson believed herself to be the victim of race or gender discrimination. Because Williamson failed to give Mercer any indication that her complaints related to race or gender discrimination, she did not engage in "protected activity" as required by Title VII's retaliation provision. Accordingly, she has not established a prima facie case of retaliation, meaning that Defendant is entitled to summary judgment on this claim.

> 3. **Failure to Promote Claim**

Williamson next complains that Mercer's failure to change her title to "Program Manager" was discriminatory. The parties seek to analyze this claim as a "failure to promote" claim. Williamson's claim, however, is not a conventional "failure to promote" claim, and therefore does not fit squarely within the prima facie framework. To establish a prima facie case of a discriminatory failure to promote, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for a position the employer was trying to fill; (3) she was rejected despite her qualifications; and (4) other equally or less-qualified employees who were not members of the protected class were promoted. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1089 (11th Cir. 2004). Williamson's claim is not a conventional "failure to promote"

claim in that she does not allege that she applied for a vacant position that Mercer was seeking to fill and was denied that position. Instead, she complains that Mercer failed to change her job title to "Program Manager" and increase her salary after she assumed some of the duties of the existing Program Manager.

The absence of a vacant position is fatal to Williamson's prima facie case. "One of the fundamental elements of a prima facie case is that there be an available job for which the employer is seeking applicants." See Duffy v. Lowe's Home Ctr., 414 F. Supp. 2d. 1133, 1143 (M.D. Fla. 2006) (internal alterations omitted). Williamson cannot rely on her unilateral expectation of reclassification and salary increase in order to establish a prima facie case of race discrimination. Furthermore, even though Brown promised Williamson that he would seek a new title for her to reflect her greater experience and increase in job duties, Mercer's failure to award her the specific title she desired does not create an inference of discrimination sufficient to satisfy her prima facie case.

Williamson argues that Brown's "change of heart"—in initially promising to change her title to "Program Manager" and later reneging on that promise—creates an inference of discrimination. The Court disagrees. Williamson's theory requires a substantial inferential leap, one that this Court is unwilling to make. Certainly, discrimination is not the only—or even the most plausible—reason for Brown's indecision. Moreover, if an employer's indecision alone was insufficient to create an inference of discrimination, any employer who ever wavered in his business judgment would expose himself to liability. Such an approach undoubtedly would quell an employer's flexibility in making business decisions—a result that courts repeatedly have sought to avoid. See, e.g., Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997)

(stressing that "federal courts do not sit to second-guess the business judgment of employers"); see also Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) ("Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions.") (internal quotation marks omitted).

However, even assuming that Williamson could establish a prima facie case of discrimination, Mercer has proffered a legitimate, nondiscriminatory reason for its failure to reclassify Williamson to "Program Manager." Brown testified that he decided against giving Williamson the "Program Manager" title after meeting with the existing Program Manager, Maria Arvelo. Arvelo objected to the title change because she believed that Williamson's job responsibilities were different from, and unequal to, her own. Brown testified that he soon realized that Arvelo was correct, and that he "was trying to solve a personnel problem with a structural change, and that was a bad management move."

Because Mercer has offered a legitimate, non-discriminatory reason for its actions, the burden shifts to Williamson to "meet the proffered reason head on and rebut it." Brooks v. County Comm'n of Jefferson County, 446 F.3d 1160, 1163 (11th Cir. 2006). To rebut the defendant's proffered reason, the plaintiff must present evidence "sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons [for its decision]." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005); Combs, 106 F.3d at 1528. This the plaintiff may do "by showing both that the reason was false, and that discrimination was the real reason." Brooks, 446 F.3d at 1163 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)) (emphasis omitted). Importantly, "a plaintiff must show not merely that the defendant's employment decisions were mistaken, but that they

were in fact motivated by race." Alexander v. Fulton County, 207 F.3d 1303, 1339 (11th Cir. 2000).

Williamson argues that Brown's reasons are pretext because: (1) Mercer has very few African-American faculty members, (2) Mercer previously has been the subject of EEOC complaints, and (3) Brown previously has been accused of being a racist. Such general and conclusory allegations are insufficient to rebut Mercer's legitimate, non-discriminatory reason for refusing to change her title. They fail to meet Mercer's proffered reason "head on" and challenge its veracity. Brooks, 446 F.3d at 1163. As Williamson has failed to create a genuine issue of material fact as to Mercer's motivation in refusing to change her title, Williamson's "failure to promote" claim fails as a matter of law.

**4. Discriminatory Terms and Conditions of Employment Claim**

Finally, Williamson claims that she was treated differently from other non-African-American employees with respect to the terms of conditions of her employment. Specifically, she alleges that: (1) Mercer did not reimburse her travel expenses at the same rate as it did for Caucasian employees; (2) a Mercer employee escorted her off of the premises when she was terminated, while failing to do the same for a Caucasian employee; and (3) Mercer required her to log her work schedule into a computer, while failing to require the same of a Caucasian male employee. In cases involving allegations of disparate treatment based on race or gender, a plaintiff establishes a prima facie case of discrimination by showing that: (1) she belongs to a protected class; (2) she was subjected to an adverse employment action; and (3) her employer treated similarly situated people outside of the protected class more favorably. Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999). As to all three of her allegations, Williamson fails

to establish a prima facie case.

### a. Travel Expenses

Williamson first claims that Mercer discriminated against her in the reimbursement of her travel expenses. Up until March 2004, the MCCD did not have a formal policy for reimbursing travel expenses. According to Williamson, however, Mercer had an unofficial policy of fully reimbursing employees for travel performed at the University's request, while partially reimbursing employees for job-related travel performed at their own suggestion.

During her thirteen-month employment with the MCCD, Williamson attended six professional development conferences. Mercer fully subsidized Williamson's attendance at five of the six conferences. With respect to the remaining conference, Mercer reimbursed fifty percent of her expenses. Williamson argues that Mercer discriminated against her by failing to reimburse all of her expenses for this one conference. Williamson further avers that, as a result of this policy, she declined to attend several additional conferences.

Williamson identifies two Caucasian men who she claims attended a greater number of conferences than she, and were reimbursed fully for all of those conferences. Neither individual is similarly situated to Williamson. To show that an employee is similarly situated, the plaintiff must show that he or she is "similarly situated in all relevant respects." Knight v. S. Baptist Hosp., 330 F.3d 1313, 1316 (11th Cir. 2003). Indeed, the comparator must be "nearly identical to the plaintiff to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Burke-Fowler v. Orange County, 447 F.3d 1319, 1323 (11th Cir. 2006).

15

Williamson's first comparator, Dr. Peter Brown— her supervisor, is not similarly situated. As the Director of the MCCD, Brown had significantly different job responsibilities from Williamson. In light of these disparate responsibilities, Mercer could have required Brown to attend a greater number of professional development conferences than Williamson. Because of the vast disparity in responsibilities, Brown is not a proper comparator for the purposes of establishing a prima facie case.

Moreover, even if Brown were similarly situated to Williamson, there is no evidence that he was treated more favorably. During the period that Williamson worked for the MCCD, Brown attended eight events. Mercer fully subsidized his attendance at all eight of these events. Williamson has not provided any evidence to suggest that any of these eight events fell into the category of events subject to partial, rather than full, reimbursement, nor has she shown that Brown attended, and received full reimbursement for, the one event for which she did not receive full reimbursement.

Williamson's second comparator, Greg Popham, likewise is not similarly situated. As a "Community Partner," Popham was not an employee of the MCCD. Instead, Popham worked with another organization in partnership with the MCCD. Moreover, even if Popham were similarly situated to Williamson, he was not treated more favorably. Mercer's records show that Popham attended only three events (in contrast to Williamson's six), and received only partial reimbursement for each of those events. (Brown Dep. Exh. 26).

Williamson's suspicion that Popham was treated more favorably arises from her having seen a copy of his travel expense log on the office photocopier. Mercer has rebutted Williamson's bald assertion that Popham received favorable treatment with documentary

evidence showing that Popham did not receive full reimbursement for his travel expenses, and Williamson has failed to refute Mercer's documentary evidence. Williamson's bald assertion that Popham received full reimbursement—when contradicted by unrebutted documentary evidence— can hardly be said to create a genuine issue of material fact as to disparate treatment.

Williamson fails to identify any other individuals who were treated more favorably than she with respect to the reimbursement of travel expenses. Accordingly, she has failed to establish a prima facie case of discrimination as to this issue.

        **b.**        **Access to MCCD Offices Following Termination**

Williamson next claims that she was denied access to MCCD offices following her termination, while a Caucasian employee, Chris Roesel, had "free reign" in the office for thirty days after he was discharged. More precisely, Williamson argues that on the date she was terminated, a Mercer Human Resources employee seized her office keys, her cellular phone, and her work computer, which contained several personal files.

These actions fail to amount to adverse employment actions for the purposes of Williamson's prima facie case. An "adverse employment action" is one that impacts the "terms, conditions, or privileges" of the plaintiff's job in a real and demonstrable way. 42 U.S.C. § 2000e-2(a); Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001). Conduct that falls short of an ultimate employment decision must meet "some threshold level of sustainability" in order to be actionable. Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998). This means that the action must have a "tangible adverse effect on the plaintiff's employment." Davis, 245 F.3d at 1239. The standard for measuring the adversity of a particular action is an objective one: "the employee's subjective view of the significance and

adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Davis, 245 F.3d at 1239.

None of the actions about which Williamson complains had a tangible adverse effect on her employment. All of the actions occurred after Williamson was terminated; therefore, none of them altered the terms and conditions of her employment. Moreover, none of the actions were "adverse." While Williamson may have subjectively perceived being escorted off of the premises and returning property belonging to Mercer as demeaning or humiliating, this subjective belief is insufficient to establish the adversity of Mercer's actions. Likewise, Mercer's temporary seizure of some of Williamson's personal files, which were stored on a computer belonging to Mercer, was not adverse, since Mercer later returned those files. (Williamson Dep. 230-31). Because none of the conduct about which Williamson complains had a "tangible adverse effect" on her employment, Williamson has failed to establish a prima facie case of discrimination with respect to this conduct.

  c. **Scheduling**

Finally, Williamson alleges that she was required to log her schedule into a computer, while two Caucasian employees, Chris Roesel and Cameron Pennybacker, were not. Like the other actions about which Williamson complains, this action does not amount to an adverse employment action. It did not affect the amount of money that Williamson, a salaried employee, was paid, nor did the practice consume a significant amount of her time. Such a *de minimus* imposition cannot be said to have had a "tangible adverse effect" on Williamson's employment. See Davis, 245 F.3d at 1239 (noting that a tangible employment action is one that "constitutes a *significant* change in employment status."). Accordingly, Williamson fails to establish a prima

18

facie case of discrimination with respect to this conduct.

**5.     Breach of Contract**

In addition to her Title VII and § 1981 claims, Williamson asserts a state law claim for breach of contract. Having granted summary judgment in favor of Mercer as to Williamson's federal claims, the Court declines to exercise supplemental jurisdiction over her breach of contract claim.

## *CONCLUSION*

For the reasons discussed above, Mercer's Motion for Summary Judgment [Doc. 23] is **GRANTED**.

**SO ORDERED**.  This 7th day of March, 2007.

S/ C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

AEG/ssh